UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JUSTIN WEHLING,

                                 **REPORT AND**
                                 **RECOMMENDATION**

                       Plaintiff,

v.                                  16-CV-00746(LJV)(JJM)

THE VILLAGE OF MEDINA,
P.O. JOSPEH FRENTZ,
P.O. EDWIN BOWER,
SGT MICHAEL BORRELL, and
"JOHN/JANE DOES 1-10"

                       Defendants.
_____

          This 42 U.S.C. §1983 action centers on plaintiff's June 20, 2015 arrest and

alleged use of force by defendant Joseph Frentz, a Police Officer with the Village of Medina

Police Department, in connection with that arrest. Complaint [1]. [1] Before the court is

defendants' motion [49] for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56, which

has been referred to me by District Judge Lawrence J. Vilardo for initial consideration [10].

Having reviewed the parties' submissions [49, 51, 53] and heard oral argument on June 18, 2019

[56],[2] I recommend that the motion be granted in part and denied in part.

---

[1]       Bracketed references are to the CM/ECF docket entries, and page references are to numbers
reflected on the documents themselves rather than to CM/ECF pagination.

[2]       At the June 18, 2019 oral argument, the parties agreed that I should delay commencing work on
the Report and Recommendation to afford them an opportunity to settle the action. I did so until October
1, 2019, when they informed me that I should proceed with rendering a Report and Recommendation.

# BACKGROUND

According to Officer Frentz, on June 20, 2015 at approximately 3:00 p.m. he was placing things into his patrol vehicle, which was parked in the alley between the police station and O'Brien's Tavern in the Village of Medina, when he heard "loud angry yelling" for "[n]o more than a minute" that was "reverberating off the buildings on Main Street and then shortly after [Jeffrey Gay] came from around the front of the bar and said there was a male pushing a female across the street". Frentz's deposition transcript [49-11], pp. 71-77, 80-83.[3] After receiving the report from Mr. Gay, Officer Frentz notified dispatch and drove out of the alley toward the direction of the yelling. Frentz's deposition transcript [49-11], pp. 84-85; defendants' Rule 56.1 Statement of Material Facts [49-2], ¶21

Plaintiff acknowledged that he and his girlfriend, Marie Ashley, "had a disagreement about Facebook" at their house located at 711 South Main Street, which was approximately 200 feet from O'Brien's Tavern. Plaintiff's General Municipal Law §50-h testimony [49-8], p. 24. He explained that "she wanted to go for a walk and I followed her out of the house [toward O'Brien's Tavern] and was telling her to come back inside . . . . I was swearing and I said the F word loud, and she wanted to sit on the park bench" on the corner of South Main and Starr Streets. Id., pp. 24, 29. Plaintiff then proceeded to walk toward his house, and was nearly there, when Officer Frentz arrived. Id., pp. 25, 34. He denied ever touching his girlfriend during their exchange. Id., p. 28.

---

[3]     In a recorded statement that Mr. Gay later gave to a private investigator, he stated that he told Officer Frentz that he was concerned for the woman, but did not believe that he told him at that time that he observed the man push her. [49-21], pp. 5-6.

**The Encounter**

Officer Fentz testified that when he arrived, he observed plaintiff and Ms. Ashley on opposite sides of the street. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶21. Officer Frentz was familiar with plaintiff and Ms. Ashley from prior incidents, including responding to a previous domestic incident between them.  Id., ¶¶21-22; plaintiff's General Municipal Law §50-h testimony [49-8], p. 31.  As plaintiff was walking away, Officer Frentz parked his vehicle in a location between plaintiff and Ms. Ashley and exited the vehicle. Although Officer Frentz testified that he asked plaintiff to stop, plaintiff denies that, but acknowledges stopping and speaking to Officer Frentz.  Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶¶27, 31; plaintiff's General Municipal Law §50-h testimony [49-8], pp. 33-35.

In response to an inquiry from Officer Frentz, plaintiff denied having any weapons on him. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶32; plaintiff's General Municipal Law §50-h testimony [49-8], p. 35.  However, plaintiff was wearing shorts with large cargo pockets on the side, and Officer Frentz testified that he observed "shapeless" bulges in those pockets.  Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶28; Frentz's deposition transcript [49-11], p. 143. Because the bulges in plaintiff's pockets made it "hard for [Officer Frentz] to determine if he did or did not have a weapon", and plaintiff's "agitated manner, his clenching fists", Officer Frentz decided to conduct a pat down. Frentz's deposition transcript [49-11], p 141; defendants' Rule 56.1 Statement of Material Facts [49-2], ¶38.  Officer Frentz testified that "[a] weapons pat-down is something that we do or I do with almost every single suspect that I'm interviewing especially when it comes to potential domestic violence situations because those are very dangerous for police officers".  Frentz's trial testimony [49-22],

p. 29. While plaintiff concedes that he had a marijuana pipe in his pocket, he testified that it did not cause a bulge in his cargo pockets. plaintiff's General Municipal Law §50-h testimony [49-8], p. 33.

Officer Frentz believed that he had reasonable suspicion of "at least a harassment" based upon the report of Mr. Gay, the yelling he heard, plaintiff walking briskly away from the scene, the prior domestic incident between plaintiff and Ms. Ashley, and his knowledge that domestic violence "usually gradually gets worse the more it occurs". Frentz's deposition transcript [49-11], pp. 147-49. Although Officer Frentz believed that he had reasonable suspicion to detain plaintiff for harassment at that point, he did not intend to issue a summons or to arrest plaintiff. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶37; Frentz's deposition transcript [49-11], pp. 148-50. Officer Frentz acknowledged that at that point it "did not reach the level of probable cause for an arrest because I hadn't even interviewed Marie yet". Frentz's deposition transcript [49-11], pp. 141, 147. However, plaintiff was not free to leave because Officer Frentz was continuing to investigate a possible harassment charge stemming from a domestic dispute, and still needed to talk to Ms. Ashley. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶41.

Officer Frentz testified that when he attempted to pat down plaintiff, he pulled his arm away and said something to the effect "don't touch me", and Officer Frentz told him to relax, that he was only checking for weapons. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶44. After Officer Frentz took hold of one arm, plaintiff spun around and began running away. Id., ¶¶45, 46. Plaintiff does not dispute that he ran from Officer Frentz, but claims that he did so when he believed that Officer Frentz was reaching for his handcuffs. Plaintiff's General Municipal Law §50-h testimony [49-8], p. 35. Contrary to Officer Frentz's version of

events, plaintiff states that Officer Frentz did not attempt to reach for or touch him before he fled. Id.

    While the incident began on the sidewalk, plaintiff eventually ran into a grassy area in the direction of his house. Frentz's deposition transcript [49-11], pp. 157-58.  Officer Frentz began to chase plaintiff, but he was carrying 35 pounds of gear that prevented him from keeping up with plaintiff.  Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶51. Officer Frentz testified that he immediately yelled to plaintiff to stop, and then approximately three to four seconds later issued a second warning to plaintiff that he would be tased if he did not stop. When plaintiff disregarded those warnings and was 15 to 20 feet away, Officer Frentz deployed his taser.  Id., ¶¶51-52, 59, 64; Frentz's deposition transcript [49-11], p. 179.  The entire event transpired in a matter of seconds.  Id., ¶50. By contrast, plaintiff testified that heard Officer Frentz yell stop, but that "there was no time to stop.  It was instantly stop, boom". Plaintiff's General Municipal Law §50-h testimony [49-8], p. 36. Plaintiff acknowledged tripping on his flip flop as he was fleeing from Officer Frentz, but denied that it caused him to fall.  Id., p. 37.

    Explaining why he needed to subdue plaintiff, Officer Frentz testified: "I hadn't had a chance to talk to Marie yet and if he gets away from me . . . I can't protect her if she leaves the area.  So at the time there was a sense of urgency for me.  You know people don't run from the police for no reason in general so I don't know at the time if he had something to hide, if he actually did cause her harm and now he's running away because he did cause her harm.  I didn't know . . . if he actually did have any weapons on him, either legal or illegal".  Frentz's deposition transcript [49-11], pp. 162-63.

Once Officer Frentz's taser struck plaintiff, he fell onto his side.  Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶65. When Officer Frentz approached plaintiff to place him in handcuffs, he noticed that he was having a seizure and found one prong of his taser in plaintiff's lower back and the other in the lower left portion of his head. Id., ¶¶66-67.  Officer Frentz had received training to avoid the head when tasering an individual, and had aimed for the middle to lower portion of plaintiff's back when he deployed the taser.  Frentz's deposition transcript [49-11], p. 191.

Officer Frentz called for an ambulance, but testified that he never placed plaintiff in handcuffs. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶¶69, 70.  Although the prongs of the taser were not removed until plaintiff reached the hospital, Officer Frentz testified that plaintiff received only the initial five second cycle of electrical charge into his body. Frentz's deposition transcript [49-11], pp. 193-94, 218-20.

Another responding officer, Edwin Bower, attempted to obtain a statement from Ms. Ashley, but she refused.  Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶75. Contrary to Officer Frentz, Officer Bower observed Officer Frentz handcuff plaintiff at the scene. Bower's deposition transcript [49-23], pp. 35, 40, 62.  However, he testified that he too observed the bulge in plaintiff's pocket, but unlike the "shapeless" bulges Officer Frentz observed, he believed that it could be a knife.  Id., p. 90.

After Officer Frentz called for an ambulance, he was approached by Samantha Williams who stated that she observed plaintiff pushing or grabbing Ms. Ashley. Frentz's deposition transcript [49-11], p. 197.  As a witness to much of the encounter, Ms. Williams provided a Supporting Deposition to law enforcement following the incident, stating that "[i]t appeared the officer just wanted to talk to the male.  The male kept putting his hands up and

backing away like he did not want to talk to the officer. The officer put his arm out and the male

took off running south . . . before the officer could grab him.  I heard the officer yell ', don't

run'.  Then I heard a pop that sounded like a tazer (*sic*)". [49-24].  Ms. Williams described that

plaintiff "looked real tense and very mad" and that Ms. Ashley "looked really scared" prior to

those events. Id.  She also later provided additional information to a private investigator in a later

notarized statement, which also largely confirmed Officer Frentz's version of events [49-25].


### Plaintiff's Injuries

Plaintiff passed out after he was tased, and remembers nothing until waking up in

the Medina Memorial Hospital. Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶92.

He was treated at the hospital, but he left that same day against medical advice. Id., ¶¶93. 94.

Two days later, he was seen at Unity Hospital for continued pain.  He explained that Medina

Memorial Hospital informed him that he sustained no fractures from the June 20 incident. [51-

14], p. 48 of 52 (CM/ECF).  Contrary to that earlier diagnosis, Unity Hospital and his primary

care physician found that he sustained a left clavicle fracture, bleeding in the left eye, and a T5-

T7 mild compression fracture. Id., pp. 34, 43-45 of 52 (CM/ECF).


### The Charges

On the day of the encounter, plaintiff was issued appearance tickets for

obstruction of governmental administration in the second degree, in violation of New York Penal

Law ("Penal Law") §195.05; disorderly conduct/fight violent behavior, in violation of Penal Law

§240.20; and unlawful possession of marijuana, in violation of Penal Law §221.05. [49-14 - 49-

16].  The charges for possession of marijuana and obstructing governmental administration were

eventually dropped by the prosecutor, but plaintiff proceeded to trial on the charge of disorderly

conduct.  He was convicted of that charge and his conviction was upheld on appeal.  *See*

Defendants' Rule 56.1 Statement of Material Facts [49-2], ¶14; People v. Wehling, 32 N.Y.3d

1210 (2019) (denying leave to appeal).


**The Causes of Action**

As a result of this conduct, plaintiff asserts causes of action pursuant to 42 U.S.C.

§1983 against the individual defendants for excessive force (First Claim), false arrest and

imprisonment (Second Claim), malicious abuse of process (Third Claim), a First Amendment

violation (Fourth Claim), and failure to intervene (Fifth Claim).  Complaint [1].  Likewise,

plaintiff asserts a claim pursuant to Monell v. Department of Social Services of City of New

York, 436 U.S. 658 (1978) against the Village of Medina. Id. He also asserts Supplemental New

York law claims against all defendants for assault and battery (Seventh Claim), false arrest and

imprisonment (Eighth Claim), intentional infliction of emotional distress (Ninth Claim),

negligent infliction of emotional distress (Tenth Claim), negligence and gross negligence

(Eleventh Claim), negligent training (Twelfth Claim), and negligent screening, hiring,

supervision and retention (Thirteenth Claim). Id.


**DISCUSSION**

**A.    Withdrawn Claims**

In response to defendants' motion for summary judgment, plaintiff withdrew his

claims for excessive force and false arrest and imprisonment against all defendants other than

Officer Frentz, as well as his claims for malicious abuse of process, malicious prosecution, and

failure to intervene. Sullivan Declaration [51-1], ¶9. Therefore, I recommend that these portions of defendants' motion be granted.

Plaintiff also acknowledges that if his claims for excessive force and/or false arrest survive summary judgment, that his state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence and gross negligence should be dismissed as duplicative. *See* Sullivan Declaration [51-1], ¶10; plaintiff's Memorandum of Law [51], Point V.


**B.    Consideration of Plaintiff's Expert Report**

Pursuant to my Fourth Amended Case Management Order [31], on the July 31, 2018 deadline for liability expert disclosures "in connection with any issue as to which [the party] bears the burden of proof (including claims, counterclaims, cross-claims or affirmative defenses)" (id., ¶2), defendants produced the report of their expert, Michael Brave [49-35]. On the deadline for "other expert testimony (*i.e.*, testimony in response to expert testimony previously designated by an opposing party, or in support of an issue as to which the offering party does not bear the burden of proof)" (Fourth Amended Case Management Order [31], ¶2), plaintiff produced the report of his expert, W. Ken Katsaris. [51-9].

Defendants argue that "the expert disclosure is a 'rebuttal expert' as plaintiff has failed to timely disclose any expert as required by this Court's Fourth Amended Case Management Order . . . that directed all expert disclosure in which a party bears the burden of proof to be disclosed no later than July 31, 2018." Defendants' Reply Memorandum of Law [53], p. 3.[4] Although defendants did not move to strike Mr. Katsaris' report, they also contend that it

---

[4]    At oral argument, defendants' counsel argued that plaintiff bore the burden of proof on his false arrest claim. However, since "[a] warrantless arrest is presumptively unlawful under New York law . . .

should be disregarded because it contains legal conclusions, does not take into account the admitted facts, and "fails to set forth 'scientific knowledge' that will assist this court" in contravention of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 596 (1993). <u>Id.</u>, pp. 3-5. As set forth below, consideration of Mr. Katsaris' report is not relevant to my resolution of the pending motion. Therefore, defendants' arguments need not be addressed at this time. If necessary, they can be renewed in a motion *in limine*.

**C.     Summary Judgment Standard**

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." <u>Ford v. Reynolds</u>, 316 F.3d 351, 354 (2d Cir. 2003).

**D.     Qualified Immunity**

"The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly

---

the plaintiff need not prove either malice or want of probable cause. Rather, the defendant has the burden of proving that the arrest was supported by probable cause." <u>Raysor v. Port Authority of New York and New Jersey</u>, 768 F.2d 34, 40 (2d Cir. 1985).

established at the time of the challenged conduct." <u>Soto v. Gaudett</u>, 862 F.3d 148, 156 (2d Cir. 2017). "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Hernandez v. Mesa</u>, __ U.S.__, 137 S. Ct. 2003, 2007 (2017).  An officer is entitled to qualified immunity if "*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could* have determined that the challenged action was lawful. Our inquiry on qualified immunity is not whether the officer *should* have acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the 'reasonable officer' *would have* acted in the same way." <u>Muschette on Behalf of A.M. v. Gionfriddo</u>, 910 F.3d 65, 70 (2d Cir. 2018) (emphasis in original).

**E.      False Arrest**

           "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law". <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996). "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." <u>Kampfer v. Pitcher</u>, 112 F.3d 504 (2d Cir. 1997).  The existence of probable cause constitutes a "total defense" to a false arrest claim. <u>Stansbury v. Wertman</u>, 721 F.3d 84, 89 (2d Cir. 2013).  In fact, "[u]nder federal law, probable cause is a complete defense regardless of whether a police encounter was justified at its inception. In other words, even if an initial <u>Terry</u> stop or car stop is unlawful, as long as the officers develop probable cause by the

time of the arrest, a false arrest claim will not lie under § 1983." Doe v. City of New York, 2018 WL 3824133, *4 (E.D.N.Y. 2018).[5] *See also* Ferguson v. City of New York, 2018 WL 3233131, *4 n. 5 (E.D.N.Y. 2018), reconsideration granted on other grounds, 2018 WL 3626427 (E.D.N.Y. 2018) (finding no false arrest claim from a Terry stop).[6]

   "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . . The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers". Weyant, 101 F.3d at 852. "The validity of an arrest does not depend upon an ultimate finding of guilt or innocence . . . . Rather, the court looks only to the information that the arresting officer had at the time of the arrest." Peterson v. County of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998).

   "An officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015). "The standard is deferential. In

---

[5]  In a stop pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968), "a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion, due to observing some objective manifestation that an individual is, or is about to be, involved in a crime". United States v. McDow, 206 F. Supp. 3d 829, 850 (S.D.N.Y. 2016). As part of a Terry stop, an officer may conduct a "limited, self-protective search for weapons", where it can be "reasonably inferred that the individual [is] armed and dangerous". Id.

[6]  By contrast, "[u]nder state law . . . a civil defendant cannot raise a defense of probable cause to a false arrest claim if the arrest was the result of an initially unlawful search or seizure". Doe, 2018 WL 3824133, *4. However, neither party draws upon that distinction.

other words, an officer lacks arguable probable cause and is not entitled to qualified immunity only where no officer of reasonable competence could have made the same choice under the circumstances." Id.

        Initially, defendants argue that plaintiff's claim fails because "there was no confinement", since he was "not handcuffed, was not placed under arrest and transported to any jail, and was not incarcerated nor imprisoned". Defendants' Memorandum of Law [49-36], pp. 11-12. That interpretation is too narrow. "Confinement that is not part of a formal arrest may give rise to a claim under § 1983." Williams v. County of Nassau, 2014 WL 4101545, *6 (E.D.N.Y. 2014). "'The detention, restraint, or confinement required in an action for false imprisonment need not have occurred under an assertion of legal authority or in a place designed for detention, and nothing fitting the popular impression of an arrest or imprisonment need have occurred. Any physical detention is an imprisonment.'" Vasquez v. Pampena, 2009 WL 1373591, *2 (E.D.N.Y. 2009) (quoting 59 N.Y. Jur.2d, False Imprisonment § 16). There were several points during the encounter that meet that definition.

        For example, Officer Frentz testified that plaintiff was not free to leave when he yelled for him to stop at the outset of the encounter, and then took hold of one of plaintiff's arms in an attempt to pat him down. Frentz's deposition transcript [49-11], pp. 146, 154-55. See Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991) ("[a]n arrest need not be formal; it may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted). Even if those actions did not create a confinement, plaintiff was confined by the time Officer Frentz drew his taser. See Jackson v. Johnson, 797 F. Supp. 2d 1057, 1067 (D. Mont. 2011) ("the non-deadly nature of a taser does not render meaningless its use in deciding whether a Terry stop escalated to an arrest. The taser properly falls among that

class of other non-deadly tactics, such as the use of handcuffs, that may 'substantially aggravate[

] the intrusiveness of an otherwise routine investigatory detention and [are] not part of a typical

Terry stop'").  There also exists a triable issue of fact as to whether plaintiff was handcuffed by

Officer Frentz after he was tasered, which would likewise constitute a confinement.  *See* Bower's

deposition transcript [49-23], p. 40.

        Alternatively, defendants argue that there was "probable cause to issue the

appearance tickets for the crimes charged".  Defendants' Memorandum of Law [49-36], p. 12.

However, probable cause is determined at the time of the confinement.  *See* McClellan v. Smith,

2009 WL 3587431, *6 (N.D.N.Y. 2009), aff'd, 395 Fed. App'x. 717 (2d Cir. 2010) ("[f]alse

imprisonment asks whether the facts known to the police officer at the time of confinement

objectively establish probable cause"). *See also* Fredericks v. City of New York, 2008 WL

756155, *1 (S.D.N.Y. 2008) ("even if defendants are correct in arguing that the conviction for

possession of stolen property foreclosed any claim for false arrest on that charge, it would not

foreclose a claim for false arrest and imprisonment from the point at which they initially arrested

plaintiff . . . to the point at which they charged him with criminal possession of stolen property").

        Given Officer Frentz's concession that he did not have probable cause to arrest

plaintiff at the time he initially encountered him (Frentz's deposition transcript [49-11], pp. 141,

147-48), it is not surprising that obstruction of governmental administration is the only charge

defendants specifically address by arguing that "Officer Frentz had probable cause to arrest the

plaintiff for fleeing and thereby committing the crime of obstructing governmental

administration". Defendants' Memorandum of Law [49-36], p. 12.  Defendants otherwise

contend that they are entitled to qualified immunity.  Id., p. 8.  In response, plaintiff argues that

since Officer Frentz did not have the right to seize him or pat him down, his arrest for

obstructing governmental administration was unlawful. Plaintiff's Memorandum of Law [51], pp. 12-13.

In relevant part, "[a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act". Penal Law §195.05. Plaintiff was charged by Misdemeanor Complaint with obstructing governmental administration in the second degree, in violation of Penal Law §195.05, for "refus[ing] to obey lawful orders to place his hands behind his head for the purpose of checking for weapons and when he refused to obey lawful orders to stop running". [49-17].

It is well settled that "[w]here the police are engaged in an illegal arrest, other unlawful seizure, or an unlawful search, no charge for obstruction of governmental administration will lie". United States v. Olavarria, 2011 WL 1529190, *7 (S.D.N.Y. 2011). Plaintiff argues that both his stop and Officer's Frentz's attempted frisk were unlawful insofar as they were in contravention of New York Criminal Procedure Law ("CPL") §140.50, which provides that a warrantless stop is justified "when [an officer] reasonably suspects that [a] person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor" (id., §140.50(1)), and that frisks are justified when an officer "reasonably suspects that he is in danger of physical injury" (id., §140.50(3)). Plaintiff's Memorandum of Law [51], pp. 14-16. He notes that while his warrantless stop may have been supported by reasonable suspicion that he committed a violation, [7] it was not supported by reasonable suspicion that he had "committed

_____

[7]    Plaintiff notes that harassment in the second degree (Penal Law §240.26), the offense being investigated by Officer Frentz at the time of the encounter, and disorderly conduct (Penal Law

- 15 -

a felony or misdemeanor" - *i.e.*, a crime. Id., p. 15. He also argues that Officer Frentz's

attempted frisk has not supported by reasonable suspicion that he "had a weapon". Id.

        Ignoring those specific arguments, defendants merely reiterate, without citation to

any case law, that "since a reasonable officer could find that plaintiff's act of fleeing and refusal

to be searched was obstructing governmental administration, the charge of obstructing

governmental administration was supported by probable cause". Defendants' Reply

Memorandum of Law [53], p. 7. There may be responsive arguments as to why plaintiff's

arguments are incorrect and his confinement was privileged, but they have not been offered by

defendants, and "it is not this Court's responsibility to raise and make counsel's arguments for

them". Flores v. Tryon, 2017 WL 3705124, *3 n. 4 (W.D.N.Y. 2017). *See also* Dickerson v.

United States Department of Veterans Affairs, 804 F.Supp.2d 1279, 1286 (M.D.Ga. 2011) ("[i]t

is the responsibility of the movant to identify his arguments, not the responsibility of the Court to

imagine and apply them without prompting"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir.

1990) ("[i]t is not enough merely to mention a possible argument in the most skeletal way,

leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its

bones").

        In the absence of any specific response to plaintiff's arguments, defendants have

not established their entitlement to summary judgment. Their equally conclusory arguments

concerning their reliance on qualified immunity likewise prevent me from concluding that they

---

§240.20(1)), are classified as violations, rather than misdemeanors or felonies, and do not constitute a
crime under Penal Law §10.00(6), which states a "'[c]rime' means a misdemeanor or a felony". *See*
Plaintiff's Memorandum of Law [51], pp. 12-13. Because disorderly conduct is a violation (as opposed to
a misdemeanor or felony), plaintiff also argues that CPL §140.10(1)(a) requires that the conduct be
committed in the officer's presence for an arrest, which did not occur here. *See* Plaintiff's Memorandum
of Law [51], pp. 12-13. *See* CPL §140.10(1)(a) (an officer may arrest a person for "[a]ny offense when
[the officer] has reasonable cause to believe that such person has committed such offense in [the officer's]
presence"). Defendants do not respond to this argument.

are entitled to summary judgment on that basis, especially given the triable issue of fact as to whether a bulge was observable in plaintiff's pocket - the alleged basis for the frisk. *See* <u>Searles v. Pompilio</u>, 652 F. Supp. 2d 432, 447 (S.D.N.Y. 2009) ("[b]ecause there are material issues of fact as to whether Pompilio had probable cause to arrest Searles, this Court cannot determine as a matter of law that Pompilio's actions were objectively reasonable. Accordingly, Pompilio is not entitled to summary judgment on grounds of qualified immunity").

While I have some doubts as to plaintiff's ability to prevail at trial, those doubts do not entitle defendants to summary judgment. *See* <u>American International Group, Inc. v. London American International Corp.</u>, 664 F.2d 348, 351 (2d Cir. 1981) ("summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial"); <u>Downes v. J.P. Morgan & Chase & Co.</u>, 2006 WL 1233939, *2 (S.D.N.Y. 2006) ("[t]hat Downes's claim is weak or unlikely to be accepted by a jury . . . does not entitle defendants to summary judgment"). Therefore, I recommend that this portion of defendants' motion be denied.

**F.      Excessive Force and Assault and Battery Claims**

Plaintiff's claims of excessive force and assault and battery appear to center on Officer Frentz's use of the taser, and the use of force that occurred thereafter. In response, defendants argue that Officer Frentz is entitled to qualified immunity for using the taser because, by his own admission, plaintiff "was fleeing, and Officer Frentz was in the midst of investigating a domestic that involved volatile behavior on the part of the plaintiff". Defendants' Memorandum of Law [49-36], p. 11. They also argue that plaintiff has submitted no admissible

evidence that plaintiff's injuries were attributable to any use of force by Officer Frentz after he was subdued. Defendants' Reply Memorandum of Law [53], p. 2.

Excessive force claims brought under §1983 and New York law are "judged under the Fourth Amendment's 'objective reasonableness' standard". Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Esperanza v. City of New York, 325 F. Supp. 3d 288, 303 (E.D.N.Y. 2018). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). "Because the Fourth Amendment test of reasonableness 'is one of objective reasonableness,' . . . the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010). That balancing is guided by "consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id.

1.      The Use of the Taser

Plaintiff admits that he "was in fact attempting to avoid being seized by Frentz" when the taser was deployed. Plaintiff's Memorandum of Law [51], p. 8. However, he argues that the use of a taser to subdue him was excessive because "the nature and severity of the crime leading to the arrest was minimal", "there was no reason for Frentz to suppose that [he] posed an

- 18 -

immediate threat to the safety of Frentz and others", "Frentz had no reason to believe [he] had a weapon", and had "no basis for a search or seizure and no warrant". Id.

Whether the use of a taser is permissible turns largely on whether the suspect poses a risk of flight.   "A review of the relevant case law generally suggests: (1) it is objectively unreasonable to taser a compliant suspect or an arrestee who is already handcuffed and secured; but (2) *it is reasonable to tase a fleeing* or unruly *suspect who has not yet been handcuffed or otherwise secured*." Lee v. City of Utica, New York,  2013 WL 12140336, *4 (N.D.N.Y. 2013) (emphasis added). *See also* Soto v. Gaudett, 862 F.3d 148, 158 (2d Cir. 2017) ("[t]hough the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight").  Plaintiff also fails to point any precedent as of June 20, 2015 that "established that a suspect who was fleeing had a right not to be stopped by means of a taser".  Soto, 862 F.3d at 159.

However, plaintiff attempts to justify his flight by arguing that Officer Frentz had no basis to seize and frisk him. Plaintiff's Memorandum of Law [51], p. 8.  Defendants do not respond to this argument.  Since there is a triable issue of fact as to whether Officer Frentz falsely arrested plaintiff,  I cannot conclude that he is entitled to qualified immunity as a matter of law because if he tasered plaintiff to effectuate a false arrest, it would "constitute[ ] a use of force where none was necessary, and no reasonable officer could have concluded otherwise". Jackson, 797 F. Supp. 2d at 1072. Therefore, I recommend that this portion of defendants' motion be denied.

2.      **Use of force after Plaintiff was Subdued**

While plaintiff appears to have sustained serious injuries, there is nothing in the record to establish that they were attributable to anything other than the fall to the ground and the seizure plaintiff sustained. Ms. Williams, a witness, stated that there was no physical contact between Frentz and plaintiff. [49-25], p. 16 of 22 (CM/ECF). Plaintiff argues, without citation to the record, that Ms. Ashley "claimed that she saw Frentz put his knee on plaintiff's back". Plaintiff's Memorandum of Law [51], p. 9. However, at oral argument, plaintiff's counsel conceded that Ms. Ashley's testimony to that effect was not part of the record.

Even if plaintiff was placed in handcuffs after he was subdued (Bower's deposition transcript [49-23], p. 40), there is nothing in the record to indicate excessive force was used to do so. Nor does plaintiff offer any evidence contradicting Officer Frentz's testimony that while the taser prongs were not removed until plaintiff arrived at the hospital, they ceased transmitting an electrical current after five seconds. Frentz's deposition transcript [49-11], pp. 193-94, 218-20. Therefore, I recommend that this portion of the motion be granted. [8]

**G.      Monell Liability**

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694.

---

[8]      Based on plaintiff's concession that his state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence and gross negligence claims are duplicative of any surviving false arrest or excessive force claims, I recommend that they be dismissed. *See* Sullivan Declaration [51-1], ¶10; plaintiff's Memorandum of Law [51], Point V.

"A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others encountering those subordinates." Gem Financial Service, Inc. v. City of New York, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018); Hamilton v. County of Onondaga, New York, 2018 WL 4554496, *14 (N.D.N.Y. 2018).

In seeking to establish Monell liability, plaintiff relies on the fact that Officer Frentz testified that he "always conducts a pat down of 'suspects' particularly in the domestic context", in contravention to "fundamental search and seizure law" and that Officer Frentz's "use of the taser . . . represents a failure of policy at a larger level than individual misjudgment". Plaintiff's Memorandum of Law [51], p. 17.

To establish Monell liability, the plaintiff must show that the practice was "so widespread as to have the force of law". Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997). "The custom need not have received formal approval by the appropriate decision-maker but plaintiff must prove that it is permanent." Hall v. Town of Brighton, 2014 WL 340106, *6 (W.D.N.Y. 2014). Without more, Officer Frentz's generalized testimony concerning his own individual practices, even if in contravention to the law, is insufficient to meet that threshold. See Carno v. United States, 2019 WL 2287966, *13 (S.D.N.Y. 2019) ("liability under § 1983 . . . needs to arise through the criteria set out in Monell

- 21 -

. . . because § 1983 does not invite counties and organizations to assume liability vicariously for the conduct of rogue individuals").

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). Before a municipality's failure to train or adequately supervise its employees can constitute "deliberate indifference" to its citizens' constitutional rights, the plaintiff must show: "(1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir. 1998).  "[A]t the summary judgment stage, plaintiffs must identify a specific deficiency in the [municipality's] training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007).

At most, plaintiff's expert opines that "at least all of this training should have been provided by the police department as these are requirements for justification for detainment, arrest, use of force, and use of the [taser]" (Katsaris Report [51-9], p. 8 (emphasis in original)), but fails to identify any specific deficiency in Officer Frentz's training that was the proximate cause of this incident. See Seri v. Town of Newtown, 573 F. Supp. 2d 661, 668 (D. Conn. 2008) (plaintiff "has not cited any specific example in these training manual documents or police training reports that amounted to a failure to train, let alone deviated from standard police

practices, which caused the officers to falsely arrest him. . . . [A]bsent a showing the town was deliberately indifferent to an obvious need for more adequate training, the absence of which was likely to result in constitutional deprivations, [defendant] cannot simply be liable for its officers' failure to comply with the proper police procedures and techniques that were in place when [plaintiff] was arrested"). Therefore, I recommend that this claim be dismissed.

## H.    Negligent Screening, Hiring, Supervision and Retention

The standard of liability differs between Monell and a state law negligent screening, hiring, supervision and retention claim. *See* Reape v. City of New York, 2010 WL 4789285, *5 n.1 (E.D.N.Y. 2010). "A negligent hiring, training, or supervision claim under New York law requires a plaintiff to allege that the defendant knew or should have known of its employee's propensity to engage in the conduct that caused the plaintiff's injuries, and that the alleged negligent hiring, supervision or retention was a proximate cause of those injuries." Paul v. City of New York, 2017 WL 4271648, *7 (S.D.N.Y. 2017). "[B]ecause New York law does not permit a claim for negligent hiring, training, retention or supervision where the defendants act in the scope of their employment", Velez v. City of New York, 2019 WL 3495642, *6 (S.D.N.Y. 2019), the plaintiff must also "establish that the employee was acting outside the scope of his or her employment". Paul, 2017 WL 4271648 at *7.

Defendants argue that since plaintiff's claims are premised on intentional conduct, the claims for negligence must be dismissed. Defendants' Memorandum of Law [49-36], p. 21. Plaintiff responds that "the doctrine of respondeat superior applies". Plaintiff's Memorandum of Law [51], p. 17. Not only is that contention not responsive to defendants' argument, it also misses the mark. As discussed above, negligent hiring, retention or supervision claims require "a plaintiff to establish that the employee was acting *outside the scope* of his or her employment

and applies only in instances where an employer cannot be held vicariously liable for an employee's torts" under the principles of *respondeat superior* for acts committed *within the scope* of the employee's employment. Paul, 2017 WL 4271648, *7 (emphasis added). Because plaintiff alleges (Complaint [1], ¶11), and defendants admit (Answer [5], ¶6), that, at all times, Officer Frentz was acting within the scope of his employment, no claim for negligent screening, hiring, supervision and retention can survive. *See* Velez, 2019 WL 3495642, at *6 ("the parties agree that '[d]uring the events at issue, the individual defendants were acting in their capacity as agents, servants and employees of the [municipality].' . . . That fact alone is sufficient to defeat Plaintiff's claim, because New York law does not permit a claim for negligent hiring, training, retention or supervision where the defendants act in the scope of their employment"). Therefore, I recommend that this claim be dismissed.


## CONCLUSION

For these reasons, I recommend that defendants' motion for summary judgment [49] be denied to the extent it seeks dismissal of plaintiff's excessive force, assault and battery, and false arrest and imprisonment claims against Officer Frentz, but otherwise be granted. Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by February 11, 2020.

Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented

to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal</u> <u>Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: January 28, 2020

/s Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge